# Exhibit A



January 19, 2021

***By Email and FedEx***

David Bernhardt, Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C.  20240
exsec@ios.doi.gov

Aurelia Skipwith, Director
U.S. Fish & Wildlife Service
1849 C Street N.W., M/S 3012
Washington, D.C.  20240
aurelia_skipwith@fws.gov

Re:    Notice of Violation of the Endangered Species Act: 2021 Revisions to Northern
        Spotted Owl Critical Habitat, 86 Fed. Reg. 4,820 (Jan. 15, 2021)

Greetings:

On behalf of Audubon Society of Portland, Cascadia Wildlands, Center for Biological Diversity, Conservation NW, EPIC, Klamath-Siskiyou Wildlands Center, Oregon Wild, Sierra Club, and The Wilderness Society[1] we write to provide you notice, pursuant to 16 U.S.C. § 1540(g), that the U.S. Fish and Wildlife Service's ("FWS") decision to revise critical habitat for the northern spotted owl violates the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

FWS published the Final Rule in the Federal Register on January 15, 2021. *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl*, 86 Fed. Reg. 4,820 (Jan. 15, 2021) ("Final Rule").  Despite soliciting comment on a proposed rule that excluded approximately 200,000 acres of critical habitat, **the final critical habitat rule eliminates nearly 3.5 million acres of critical habitat for the owl.**  The Final Rule will become effective 60 days following Federal Register publication or on March 16, 2021.  Unless FWS withdraws the 2021 Northern spotted owl Critical Habitat Rule and remedies its legal violations, at the end of 60-days' time, we will commence litigation to challenge and vacate the Rule.

---

[1] We have attached a list of these organizations' business addresses to the end of this letter.

**Exhibit A**
**Page 1 of 19**

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 2


I.      INTRODUCTION

FWS protected the northern spotted owl as a threatened species under the ESA in 1990. *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).  A medium-sized, chestnut-brown owl mottled with white spots, FWS listed the northern spotted owl in large part due to the destruction of its structurally complex old-growth forest habitat through commercial logging.

FWS first designated critical habitat for the owl in 1992, protecting owl habitat on 6,887,000 acres of public forestland in California, Oregon, and Washington.  *Determination of Critical Habitat for the Northern Spotted Owl*, 57 Fed. Reg. 1,796 (Jan. 15, 1992).  Critical habitat designation provides essential protections for the northern spotted owl by preventing federal agencies from permitting, funding, or carrying out actions that "destroy" or "adversely modify" these designated areas.  16 U.S.C. § 1536(a)(2).  Because of the seriousness of the threat posed by habitat destruction, critical habitat is one of the most important protections provided by the ESA for the spotted owl.

The timber industry and its allies began an immediate political and legal attack on both the owl listing and the designation of critical habitat.  These efforts first came to fruition in the second Bush administration, and in 2008, as part of a settlement of an earlier timber industry lawsuit, FWS eliminated approximately 1.5 million acres of federal forestland from protected status.  *Revised Designation of Critical Habitat for the Northern Spotted Owl*, 73 Fed. Reg. 47,326 (Aug. 13, 2008).  Conservation groups, including many on this notice letter, successfully challenged that reduction, citing demonstrable political interference and failure to comply with the ESA's best science mandate.  *Carpenters Industrial Council v. Kempthorne*, No. 08-1409-EGS (D.D.C.).  FWS retracted the downward revision, issued a draft economic analysis for critical habitat, and in 2012 issued a new critical habitat rule based on the best available science that expanded the prior designation and protected approximately 9.5 million acres of federal and state forestland as critical to the owl's survival and recovery.  *Endangered and Threatened Wildlife and Plants: Designation of Revised Critical Habitat for Northern Spotted Owl*, 77 Fed. Reg. 71,876, 71,877 (Dec. 4, 2012).

In the 2012 critical habitat rule, FWS excluded, pursuant to ESA § 4(b)(2), "specific areas covered under conservation agreements, programs, and partnerships," of approximately four million acres.  77 Fed. Reg. at 71,890–91, Table 2.  FWS explained that when it considered the benefits of exclusion, it considered the benefits of exclusion <u>to conservation of the northern spotted owl</u>.  "[W]e consider, among other things, whether exclusion of a specific area is likely to result in the overall conservation of the northern spotted owl through the continuation, strengthening, or encouragement of partnerships and the implementation of management plans or programs that provide equal or more conservation for the northern spotted owl than could be achieved through a designation of critical habitat."  *Id.* at 71,945.  "[W]e provide our analysis of areas that were proposed as revised designation of critical habitat for the northern spotted owl,

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 3

for which there may be a <u>greater conservation benefit to exclude</u> rather than include in the designation. Our weighing of the benefits of inclusion versus exclusion considered all relevant factors in order to make our <u>final determination as to what will result in the greatest conservation benefit to the owl</u>." *Id.* at 71,947 (emphasis added). This focus of comparison on benefits to the species aligns with Congress's command to strike "the balance in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). It also makes sense in the statute's structure, as FWS considers the economic impacts of critical habitat designation under a separate section of the Act.

The timber industry and timber-dependent counties challenged the 2012 critical habitat rule, with FWS issuing the revision at issue here pursuant to a second settlement agreement in the long-pending federal lawsuit *Pacific Northwest Regional Council of Carpenters et al. v. Bernhardt et al.*, No. 13-361-RJL (D.D.C.). Under the settlement agreement, FWS agreed to propose a revised critical habitat rule that identified proposed exclusions under section ESA Section 4(b)(2) of the ESA and to submit a final revised critical habitat rule or withdraw the proposed rule by the end of December 2020. *Id.* at ECF 126, ¶ 2.

In line with this settlement agreement, FWS proposed to exclude 184,476 acres of Bureau of Land Management ("BLM") lands in southwest Oregon "where programmed timber harvest is planned to occur" under the BLM's 2016 Resource Management Plans ("RMPs") in August 2020. *Proposed Rule, Revised Designation of Critical Habitat for the Northern Spotted Owl*, 85 Fed. Reg. 48,487 (Aug. 11, 2020). Conservation groups submitted comments on the proposed revisions opposing the elimination of critical habitat on this set of BLM lands as contrary to the best available science, and arbitrary and capricious given the uncertain status of BLM's 2016 RMPs and FWS's past statements that those areas were essential to the owl's survival and recovery; the groups did not oppose the exclusions proposed on Tribal lands.

Following FWS's proposed revision of critical habitat, but before the issuance of the final revision at issue here, FWS responded to a petition from conservation groups to "uplist" the spotted owl from threatened to endangered. *12-Month Finding for the Northern Spotted Owl*, 85 Fed. Reg. 81,144 (Dec. 15, 2020). In that finding, FWS recognized that the northern spotted owl warranted listing as an endangered species, but demurred, stating that its "uplisting" was "precluded by higher priority actions...." *Id.* at 81,144. Even while declining to act, FWS explained that:

> Habitat loss was the primary factor leading to the listing of the northern spotted owl as a threatened species, and it continues to be a stressor on the subspecies due to the lag effects of past habitat loss, continued timber harvest, wildfire, and a minor amount from insect and forest disease outbreaks. … Populations of northern spotted owls in several long-term demographic monitoring areas have declined more than 70 percent since the early 1990s, and the extinction risk for northern spotted owl populations has increased, particularly in Washington and Oregon.

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 4

*Id.* at 81,145.  Consequently, according to the agency, the northern spotted owl continues to decline across its range with habitat loss remaining a primary threat to the species.

A month after recognizing the species' ongoing and dramatic decline, on January 13, 2021, FWS announced a final rule reducing protected critical habitat by nearly 3.5 million acres. *Final Rule, Revised Designation of Critical Habitat for the Northern Spotted Owl*, 86 Fed. Reg. 4,820 (Jan. 15, 2021).  The Final Rule dramatically increased the narrow, proposed exclusions set forth in the draft rule; instead, the Final Rule excludes:

(1)    All O&C lands, whether managed by the BLM or Forest Service (approximately 1,391,714 acres);
(2)    Forest Service "matrix lands" addressed in the Northwest Forest Plan and not already managed under the O&C Act (approximately 2,047,929 acres);
(3)    Lands managed under BLM's 2016 RMPs as Harvest Land Base, though not under the O&C Act (referred to as "matrix" prior to the 2016 RMPs) (approximately 12,046 acres);
(4)    Northern spotted owl critical habitat lands within the Forest Service Special Use Permit for the White Pass Ski Area (approximately 211 acres); and
(5)    Additional Tribal lands (approximately 20,177 acres).[2]

*Id.* at 4,831.

## II.    PROTECTION OF CRITICAL HABITAT IS A CENTRAL ELEMENT OF THE ESA FRAMEWORK

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved ... [and] to provide a program for the conservation of such endangered species and threatened species...."  16 U.S.C. § 1531(b).  Before a species receives any protection under the ESA, FWS or the National Marine Fisheries Service ("NMFS") must list the species as "threatened" or "endangered."  *Id.* § 1533(a), (c).  An "endangered species" is one that is "in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A "threatened species" is one that is "likely to become an endangered species within the foreseeable future through all or a significant portion of its range."  *Id.* § 1532(20).  "Species" includes any subspecies of wildlife, such as the northern spotted owl.  *Id.* § 1532(16).

Congress recognized that habitat loss was "the major cause for the extinction of species worldwide."  H.R. Rep. No. 1625, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.C.C.A.N. 9453, 9455.  Section 4 of the ESA requires designation of "critical habitat" for threatened and

---

[2] Conservation groups do not challenge the Tribal lands or White Pass Ski Area exclusions.

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 5

endangered species at the time of listing, to the maximum extent prudent and determinable.  16
U.S.C. § 1533(a)(3)(A)(i).

The ESA defines critical habitat as specific areas: (1) within the geographic area
occupied by the species at the time it is listed, on which are found those physical or biological
features that are "essential to the conservation of the species" and which may require special
management consideration or protections, and (2) outside the geographic area occupied by the
species at the time it is listed that are "essential for the conservation of the species."  *Id*. §
1532(5)(A)(i), (ii).  The Ninth Circuit has emphasized that "the purpose of establishing 'critical
habitat' is for the government to carve out territory that is not only necessary for the species'
survival but also essential for the species' recovery."  *Gifford Pinchot Task Force v. U.S. Fish &
Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004).

FWS must make critical habitat determinations "on the basis of the best scientific data
available and after taking into consideration the economic impact … and any other relevant
impact, of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2).  "The
obvious purpose of the requirement that each agency 'use the best scientific and commercial data
available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation
or surmise."  *Bennett v. Spear*, 520 U.S. 154, 176 (1997).  The failure to use the best available
science is an indication that FWS abused its discretion in making a revision to a critical habitat
designation.  *Id*. at 172.  It is FWS's policy that the best available science upon which critical
habitat decisions must be based includes sources such as a species' recovery plan, articles in
peer-reviewed journals, conservation plans for the species, scientific status surveys and studies,
biological assessments, or other expert opinion.  85 Fed. Reg. at 48,490.

Section 4(b)(2) of the ESA imposes a duty on FWS to consider the economic, national
security, and "any other relevant impact" of specifying a particular area as critical habitat.  16
U.S.C. § 1533(b)(2).  FWS is also required to "make available for public comment the draft
economic analysis of the designation. The draft economic analysis will be summarized in the
Federal Register notice of the proposed designation of critical habitat."  50 C.F.R. § 424.19(b).
FWS may exclude an area from critical habitat only if it "determines that the benefits of such
exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it]
determines, based on the best scientific and commercial data available, that the failure to
designate such area as critical habitat will result in the extinction of the species concerned."  16
U.S.C. § 1533(b)(2).  FWS's determination is then reviewable to see if the agency "abused its
discretion" in eliminating any protections.  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139
S. Ct. 361, 371 (2018).

In 2016, FWS and NMFS published a final policy to further explain how the Services
conduct their discretionary exclusion analyses (the "2016 Policy").  *See* 81 Fed. Reg. 7,226 (Feb.
11, 2016).  The 2016 Policy provides that the Services will prioritize designation of critical
habitat on federal lands, and "focus our exclusions on non-Federal lands."  *Id*. at 7,232.  The
policy recognizes the high conservation value of designating federal lands because of the

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 6

affirmative duty ESA Section 7 places on federal agencies to "utilize their authorities in furtherance of the purposes" of the Act and to "insure" that any actions authorized, funded, or carried out by a federal agency do not destroy or adversely modify critical habitat.  16 U.S.C. § 1536(a)(1), (2); *see* 81 Fed. Reg. at 7,231.

III.     THE REVISED DESIGNATION OF CRITICAL HABITAT VIOLATES THE ENDANGERED SPECIES ACT AND ITS IMPLEMENTING REGULATIONS.

        In 2012, when FWS last designated critical habitat for the northern spotted owl, it found those areas essential for the owl's survival and recovery.  77 Fed. Reg. at 71,877.  FWS's revision to that designation now strips over a third of those lands of critical protections.  86 Fed. Reg. at 4,820.  FWS failed to ground its decision in the ESA's statutory text, conservation purpose, implementing regulations, or the best available science.  Rather, FWS relied on a hastily cobbled together process prioritizing deregulation and alleged benefits of exclusion that lack any meaningful support and are not focused on benefits to the listed species.  FWS's actions violate the ESA and are arbitrary, capricious, an abuse of discretion, and contrary to law.  5 U.S.C. § 706(A)(2).

        In its Proposed Rule, FWS explained that:

        When determining which areas should be designated as critical habitat, our primary source of information is the status analysis in the listing rule and other information developed during the listing process for the species.  Additional information sources may include any generalized conservation strategy, criteria, or outline that may have been developed for the species; the recovery plan for the species; articles in peer-reviewed journals; conservation plans developed by States and counties; scientific status surveys and studies; biological assessments; other unpublished materials; or experts' opinions or personal knowledge.

85 Fed. Reg. at 48,490.  Yet at the same time, FWS stated that "this proposed rule focuses only on new exclusions under section 4(b)(2) of the Act in response to a stipulated settlement agreement."  *Id*. at 48,487.  This justification is also present in the Final Rule.  86 Fed. Reg. at 4,820–21.  FWS's main justification in this rulemaking—a settlement agreement—is one that "Congress did not intend it to consider," rendering this rulemaking arbitrary, capricious, and not in accordance with law.  *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010); 5 U.S.C. § 706(2)(A).

        The revised critical habitat designation, issued at the same time that the owl continues to decline across its range, represents an abuse of discretion, is arbitrary and capricious, and violates the ESA because (1) FWS failed to justify its conclusion that the benefits of exclusion outweigh the benefits of inclusion when the best available science demonstrates that such areas are essential to the owl's survival and recovery; (2) FWS failed to adequately explain why the excluded lands are no longer essential to the northern spotted owl's survival and recovery; (3)

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 7

FWS failed to apply the correct legal standard when deciding to exclude nearly 3.5 million acres of critical habitat; (4) FWS ignored the role such areas play in the owl's recovery; (5) FWS failed to adhere to the ESA's precautionary principle; (6) FWS failed to conduct a new economic impact analysis; and (7) FWS failed to provide an adequate opportunity for notice and comment.

>    A.    FWS's Decision That the Benefits of Exclusion Outweigh the Benefits of Critical Habitat Inclusion Under ESA § 4(b)(2) Is an Abuse of Discretion and Contrary to Law.

When promulgating the Final Rule, FWS stated that it was not revisiting its prior determination that all units and subunits of critical habitat designated in 2012 are essential to the conservation of the species, and it undertook no new economic analysis. 86 Fed. Reg. at 4,824, 4,831. Instead, focusing solely on the ESA § 4(b)(2) exclusion process, FWS asserted that the new exclusions reflect "new conclusions by the Secretary as to the weight to be accorded to various benefits." 86 Fed. Reg. at 4,824. FWS, however, abused its discretion in reaching these "new conclusions," which are grounded in neither law or fact, and ignored the best available science demonstrating that the excluded lands are essential to the owl's survival and recovery. Nor does FWS adequately support its conclusion that exclusion of these lands will not result in the extinction of the species, especially given the long history of protecting these lands as essential for the owl's survival and recovery and the owl's continued precipitous decline.

Indeed, FWS's newly found reasons for excluding federal lands from the owl's critical habitat designation do not stand up to even passing scrutiny. For instance, to justify the exclusion of 1,373,693 acres of O&C Lands, FWS states that commenters requested that they be excluded, the O&C Act mandates a sustained yield timber harvest, the exclusion could lead to increased timber production, the exclusion could possibly lessen the risk of catastrophic wildfire, and the exclusion may protect "local custom and culture." 86 Fed. Reg. 4,839–40. FWS also attempts to justify the exclusion on the basis that the Secretary has the discretion to do so and that it is in line with the Trump administration's deregulatory agenda. *Id.* at 4,840. FWS echoes these reasons to justify excluding 2,077,697 acres of critical habitat on Forest Service and BLM matrix lands. *Id.* at 4,839–40.

As an initial matter, the fact that an agency has the discretion to act does not itself justify its action. The existence of discretion to act is only the first step. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The agency must also show that its "decision was based on a consideration of the relevant factors." *Id.* The failure to do so is an "abuse of discretion." *Id.*

And it is clear that FWS failed to consider the relevant factors here—whether the benefits of exclusion outweigh the benefits of inclusion for the species—as none of the given reasons for the agency's action can bear the weight assigned to them. First, a self-serving request from a private commentator cannot provide the sole basis for an agency action that must be based on the best available science. 16 U.S.C. § 1533(b)(2). Nor can FWS' invocation of the O&C Act

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 8

justify its decision as it stands in sharp contrast to its previous recognition (and long-standing Department and Solicitor legal interpretations) that the designation of critical habitat "does not preclude the sustained-yield timber management of O&C lands consistent with the … requirements of the Act."[3]  77 Fed. Reg. at 72,010.  Regardless, the mandate governing O&C lands does not strip the agencies of all discretionary authority to take action for the benefit of listed species.  FWS's exclusion of matrix lands stand on even shakier ground, given that there can be no dispute that all national forestlands are managed for multiple uses, including wildlife protection.

Additionally, lacking a new economic analysis, FWS's speculation that exclusion could result in increased timber harvest is strikingly at odds with its prior finding that exclusion would only result in a minimal increase in timber production and that "impacts to revenue payments resulting from the designation are likely to be small."  *See id.* at 72,032 (finding that "the potential decrease in harvest from BLM lands represents approximately 2% of total harvests from BLM lands" in effected counties); *see also* 86 Fed. Reg. at 4,827 (acknowledging that any economic benefits resulting from the exclusion are likely to be "relatively small").  FWS has made no new showing that exclusion will actually increase the rate of timber harvest on federal lands.  Rather, FWS recognizes that the 2012 critical habitat designation appeared to have no significant effect on timber harvest levels one way or another.  86 Fed. Reg. at 4,827.  In any case, FWS failed to meaningfully consider the costs associated with timber harvest, both to the owl itself and to the ecosystem more broadly.

Similarly, FWS provides no support for its assertion that the exclusion could decrease the risk of "catastrophic" wildfire.  "May," "could," and "possibly," 86 Fed. Reg. at 4,821, 4,823, cannot be justifications for the exclusion of areas from critical habitat as "[t]he obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."  *Bennett v. Spear*, 520 U.S. 154, 176 (1997).  In the end, this justification is little more than a smoke screen for "[a]uthorizing and conducting more timber sales…."  *Id.* at 4,840.

---

[3] FWS assert without citation that "the Supreme Court has additionally determined that the ESA does not take precedence over an agency's mandatory (non-discretionary) statutory mission."  86 Fed. Reg. at 4,822.  This assertion is wrong and runs directly counter to the text and purpose of the ESA, where Congress required federal agencies to "give the benefit of the doubt to the species[,]"  H.R. Conf. Rep. No. 96-697, at 12, as reprinted in 1979 U.S.C.C.A.N. 2572, 2576, and to prioritize species protection over the primary missions of all federal agencies.  *Tenn. Valley Auth.*, 437 U.S. at 184–85, 179–83.  Even for O&C lands, which are managed under a separate 1937 statute, federal agencies cannot skirt their duties under the ESA.  *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1314 (W.D. Wash. 1994).  BLM has recognized as much.  *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1506 (D. Or. 1992) ("The BLM concedes that the provisions of the Endangered Species Act must be enforced despite any adverse effects upon the amount of timber available on O & C lands.").

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 9

FWS further speculates that the removal of critical habitat protections may result in "[l]onger cycles between timber harvest" with alleged benefits for the northern spotted owl. 86 Fed. Reg. at 4,821. But this assertion is undercut by FWS' recent recognition that "continued timber harvest" continues to be a stressor on the northern spotted owl, contributing to FWS recognition that the subspecies warrants listing as an endangered species. 85 Fed. Reg. 81,114, 81,145 (Dec. 15, 2020). As such, it is irrational to assert any benefit from "making more lands available for timber harvest" outweighs the impact to this critically imperiled species. 86 Fed. Reg. at 4840.

Nor does FWS's "recognition of the expertise of locally elected governments in areas relating to the stability of the local economy" and the consideration of "protection of the local custom and culture of the county" find any grounding in the ESA. 86 Fed. Reg. at 4,840. As an initial matter, FWS does not explain what it means by "custom and culture," and indeed this phrase has no common biological meaning. Instead, it is a phrase embraced by the anti-government wise use movement and the author of the Final Rule.[4] *Id.* at 4,844 ("The primary author of this final rule was Karen Budd-Falen, Deputy Solicitor, Parks and Wildlife, Immediate Office of the Solicitor, Department of the Interior"). Moreover, the counties affected by the Final Rule are not of a monolithic identity: indeed, many members of the conservation organizations that are signatories to this letter live in these same counties, and vehemently oppose the elimination of critical habitat there: the claim that the Final Rule serves these interests is erroneous at best.

While it is true that FWS may take "into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat," 16 U.S.C. § 1533(b)(2) (emphasis added), those other impacts must be relevant and bear some relation to the enumerated ones. Otherwise any and all impacts could be considered, regardless of whether they are actually "relevant" to the designation of critical habitat. *Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1105 (D. Ariz. 2003) (questioning what constitutes a relevant impact). While FWS may assign the weight given to any of the benefits of inclusion/exclusion, *see* 2016 Policy, 81 Fed. Reg. at 7,228, it cannot provide reasons based on the alleged "expertise" of nonfederal elected officials with no ecological or relevant expertise. *Defenders of Wildlife v Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997) ("Although the court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts"). And FWS has abandoned, without explanation, its position in the 2012 critical habitat designation that benefits of inclusion and exclusion must be viewed through a conservation of the species lens.

---

[4] Jacqueline Vaughn Switzer, *The History and Politics of Environmental Opposition in the US*, Lynne Rienner Publishers, 1997; Dan Meyers, *Anger Is Rising In A Western Turf War Ranchers And Others, United In Outrage, Challenge Federal Control. How Far Will The Battle Go?*, Philadelphia Inquirer, May 19, 1994; Candace Burns, *N.M. Land Use Model Confuses Officials, Environmentalists*, Post Register, April 1, 1993.

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 10

Confusingly, FWS also points to the costs allegedly associated with "the additional requirement for completing section 7 consultation" which "constitutes a regulatory hurdle for Federal agencies in completing their duties under their organic statutes."[5] 86 Fed. Reg. at 4,838. In the same breath, however, FWS states that "Federal agencies cannot fund, authorize, or carry out any discretionary activity that result in jeopardy to a listed species," and since the northern spotted owl occupies all areas within the 2012 critical habitat designation, "section 7 consultation would occur regardless of whether the habitat is designated as critical habitat." *Id.* But if section 7 consultation would occur regardless, then few, if any, costs are saved while the owl is stripped of essential protections preventing the adverse modification or destruction of its critical habitat—regardless of whether it is currently occupied.

Finally, the Trump administration's deregulatory agenda cannot provide a reasoned explanation for the exclusion of critical habitat as the agenda of any given administration cannot override the express will of Congress or be grounded in mere preference. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (holding that "[a]n agency's view of what is in the public interest may change, … [b]ut an agency changing its course must supply a reasoned analysis . . .").

On the opposite side of the scale, FWS gives short shrift to the benefits of retaining these nearly 3.5 million acres as designated critical habitat. *Id.* at 4,840. FWS fails to adequately weigh the benefits of exclusion against the benefits of inclusion for the species and effectively ignores its previous conclusions that O&C lands and matrix lands "make a significant contribution toward meeting the conservation objectives for the northern spotted owl," "that [FWS] cannot attain recovery without them," that "the retention of high quality habitat in the matrix is essential for the conservation of the species," since without the designation "[p]opulation performance … fared very poorly[,]" and that the exclusion of matrix lands from critical habitat "resulted in a significant increase in the risk of extinction for the northern spotted owl." 77 Fed. Reg. at 72,007. These prior conclusions remain highly relevant given the species' continued decline, the critical role these areas play in the owl's survival and recovery by providing migration dispersal corridors linking the Coast Range and Cascade range, and FWS' own determination that as a result of the species' imperiled state, it should be listed as endangered.

Courts have uniformly struck down FWS's position that designation of critical habitat provides little benefit because the species itself remains listed. In *Conservation Council for*

---

[5] Another alleged benefit of exclusion is the saving of costs for the agency itself. 86 Fed. Reg. at 4,838. Categorizing cost as a regulatory hurdle for federal agencies in completing their duties under their organic statutes turns Congress's command on its head. It is also an insufficient legal basis for failing to comply with the Act. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1184 (10th Cir. 1998) (holding that the "resource limitations can[not] justify the [Service's] failure to comply with mandatory, non-discretionary duties imposed by the ESA")

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 11

*Hawai'i v. Babbitt,* the court found that Section 7 requirements were enhanced with designation of critical habitat, noting that there are "significant substantive and procedural protections" from the designation of critical habitat apart from what a declaration of listed status provides.  2 F. Supp. 2d 1280, 1287 (D. Hawai'i 1998).  Critical habitat designations "may provide more information regarding the importance of certain elements of the species' environment." *Id.* at 1286, footnote n.8.  "Substantively, critical habitat designation establishes a uniform protection plan prior to consultation.  In the absence of such designation, the determination of the importance of a species' environment will be made piecemeal, as individual federal projects arise and agencies consult with the FWS." *Id.* at 1287–88; *see also Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1172–73 (D.N.M. 2000) (same).  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1145–46 (N.D. Cal. 2006) (vacating FWS decision that the benefits of exclusion of outweighed the benefits of inclusion based on erroneous legal conclusion of no additional benefits from critical habitat).

In the end, FWS' current reasons for exclusion rest on little more than speculation and conjecture as FWS provides no information—beyond a single public comment letter from a private association which FWS itself found flawed—justifying these supposed benefits.  And when designating or revising critical habitat, FWS must base its decision on the best available science and "cannot act on pure speculation or contrary to the evidence." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2009).  FWS does exactly that here, creating putative benefits out of whole cloth while ignoring its previous conclusions based on the best available science that O&C lands and matrix lands are essential to the owl's survival and recovery.  In doing so, FWS' abused its discretion and violated the ESA when it excluded nearly 3.5 million acres essential to the owl's survival and recovery from its critical habitat designation.

B.    FWS Failed to Explain Why Critical Habitat That It Previously Found Essential to the Survival and Recovery of the Northern Spotted Owl Is No Longer Necessary.

Fundamentally, FWS has failed to adequately explain why it no longer believes that the federal lands designated in 2012 are necessary for the owls' survival and recovery. *See, e.g.*, 77 Fed. Reg. at 72,007 ("O&C lands … make a significant contribution towards meeting the conservation objectives for the northern spotted owl…, and that [FWS] cannot attain recovery without them.") (emphasis added).  Indeed, FWS considered excluding O&C and matrix lands from its 2012 critical habitat designation (which FWS says it is not reconsidering) but declined to do so, finding that "they play a truly essential role in the conservation of the species." *Id.* Justifying their inclusion in 2012, FWS stated that the failure to include federal lands such as the matrix lands "resulted in a significant increase in the risk of extinction for the northern spotted owl." *Id.*

In contrast, FWS now provides little explanation for why such lands do not constitute "highly valuable northern spotted owl habitat." *Id.* at 71,881.  The flimsy justification FWS does provide, that the exclusion provides "no incremental conservation benefit over what is already provided for," 86 Fed. Reg. at 4,824, conflicts with FWS's prior finding that the owl "fared very

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 12

poorly" on reserves within the Northwest Forest Plan ("NWFP") compared to designated critical habitat. 77 Fed. Reg. at 72, 007.

Providing suitable nesting, roosting, foraging, and dispersal habitat is critical to the survival of the northern spotted owl as the owl is still declining and faces an uncertain future.[6] Past status reviews advised that protection for all suitable owl habitat was critical to owl survival and recovery, and found that the Northwest Forest Plan reserves were integral to spotted owl survival and recovery. FWS's 2021 revision to northern spotted owl critical habitat fundamentally conflicts with these scientific findings.

FWS also walks back its conclusions in the 2016 BLM RMPs as well as its biological opinion on those plans.[7] Although the owl's status has not changed since 2016 (and in fact continues to decline to the point where FWS believes the species should be uplisted to endangered throughout its range), and current stressors such as wildfire and climate change continue to exacerbate the situation, FWS now apparently believes that critical habitat on millions of acres is no longer necessary to the species' conservation. There is no factual or scientific support for this shift in position. *State Farm*, 463 U.S. at 42 ("an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance"); *F.C.C. v. Fox Television Studios*, 556 U.S. 502, 515 (2009) (an agency must provide a "reasoned explanation" for its reliance on factual findings that contradict earlier findings by the agency").

It is also unclear how the status quo ante of regulatory oversight given to critical habitat is "unnecessary." FWS has itself acknowledged that critical habitat adds a level of protection not otherwise available to the species. According to FWS:

> The designation of critical habitat … is one of several measures available to contribute to the conservation of a species. Critical habitat helps focus conservation activities by identifying areas that contain essential habitat features (primary constituent elements) regardless of whether or not they are currently occupied by a species. Such designations alert Federal Agencies, States, the public, and other entities about the importance of an area for the conservation of listed species. Critical habitat can also identify areas that may require special management or protection. Areas designated as critical habitat receive protection under Section 7 of the Act with regard to actions carried out, funded, or authorized by a Federal Agency which are likely to adversely modify or destroy

---

[6] *See* Bigley et al. 2004. *Scientific evaluation of the status of the northern spotted owl.* Sustainable Ecosystems Institute. Portland, Oregon. September 2004.

[7] When stripping BLM lands of critical habitat protections, FWS fails to acknowledge that the 2016 BLM RMPs face ongoing legal challenges and that their future is uncertain. *See, e.g.*, *Am. Forest Res. Council et al.* v. *Steed,* No. 16–1599–RJL (D.D.C.) (requesting that the court vacate the 2016 Plans, or in the alternative, eliminate ESA protections across the O&C land estate).

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 13

critical habitat.  The added protection of these areas may shorten the time needed
to achieve recovery.

57 Fed. Reg. at 1,796.  In 1992, when critical habitat for the owl was first designated, FWS
stressed the importance of critical habitat protections on these federal lands, finding that "[t]he
majority of owls and owl habitat (about 85 percent) are currently found on Federal lands.  These
lands are particularly important in the State of Oregon because very little owl habitat remains on
non-Federal lands in that state.  The Oregon and California lands, managed by the Bureau are
*more crucial to owl conservation than many other lands*."  *Id.* at 1,629.  None of the reasons
given for the exclusion justify FWS's decision to strip vital protections from lands essential to
the owl's recovery.

FWS's exclusion also arbitrarily ignores its previous findings in the northern spotted
owl's recovery plan.  When designating critical habitat for the owl in 2012, FWS explicitly
"relied on the recovery criteria set forth in the Revised Recovery Plan … to determine what is
essential to the conservation of the species."  77 Fed. Reg. at 71,877.  Specifically, the Final Owl
Recovery Plan recommended protecting all of the older, complex forests on federal lands west of
the Cascades' crest.  *See* Final Spotted Owl Recovery Plan at III-67;[8] *see also* SEI Review at 15
("Acknowledging that the pace of timber harvest in Northern Spotted Owl habitat on federal land
has greatly declined 1990-2007, we view the continued conservation of [late successional old-
growth] forest to be paramount for Northern Spotted Owl recovery").

Given the need expressed in the Recovery Plan to conserve more and not less critical
habitat, and FWS' determination that the species should be uplisted to endangered due to the
continued effects of habitat loss, FWS's decision to strip protections from millions of acres of
critical habitat flies in the face of its previous findings that such areas are essential to the owl's
survival and recovery. FWS's failure to provide a reasoned explanation for its change in position
renders the Final Rule arbitrary and capricious and an abuse of discretion.  *F.C.C. v. Fox*, 556
U.S. at 515.

C.    FWS's Exclusions Are Based on the Wrong Legal Standard

FWS sets an illegally low bar to justify its exclusions, stating that "the legal standard
under which exclusions are evaluated is whether, based on the best scientific and commercial
data available, the Secretary concludes that the exclusions "will result in extinction of the
species."  86 Fed. Reg. at 4,841.  In doing so, FWS conflates the legal standard of review with a
hard limit Congress placed on FWS's discretion.

---

[8] U.S. Fish and Wildlife Service. 2011. *Revised Recovery Plan for the Northern Spotted Owl
(Strix occidentalis caurina).* U.S. Fish and Wildlife Service, Portland, Oregon. xvi + 258 pp.

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 14

Section 4(b)(2) states that:

> The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

16 U.S.C. § 1533(b)(2).

The Supreme Court recently made clear that FWS' decision to exclude or not exclude an area based on economic impacts or other relevant impacts is reviewable "for abuse of discretion." *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018). FWS abuses its discretion "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The ESA backstops this general check on the Secretary's authority with the requirement that the Secretary may not exclude an area if "based on the best scientific and commercial data available, … the failure to designate such area as critical habitat will result in the extinction of the species concerned." 16 U.S.C. § 1533(b)(2). But this is a separate determination apart from the Secretary's determination "that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Id.*

Such a low bar conflicts with the ESA's conservation purpose. In essence, FWS argues that it may exclude any and all areas from a designation up until doing so would result in the extinction of the species. Not only does this completely ignore the vital role critical habitat plays in the recovery of the species, it even ignores the role it plays in the survival of the species. In essence, it would allow FWS to exclude all areas from a critical habitat designation as long as FWS determines that the exclusion itself is not the but for cause for the species' extinction. This clearly is not what Congress intended for the ESA.

D.    FWS Ignored the Goal of Recovery When Finalizing Exclusions.

FWS also ignored the fundamental goal of the ESA to restore species facing extinction to the point that they no longer need the protections of the Act when eliminating protections from vast areas of critical habitat. Recognizing that habitat loss is the primary threat to 85% of all endangered species, Congress amended the ESA in 1978 to require the designation of mapped critical habitat areas for all listed species. The Act's stated policy is to "conserve" threatened and endangered species, 16 U.S.C. § 1531(c)(1), and "conservation" is defined as the use of "all methods and procedures which are necessary to bring any endangered species or threatened

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 15

species to the point at which the measures provided [under the ESA] are no longer necessary." *Id.* § 1532(3). The clearest expression of that goal is through the designation of critical habitat, which Congress explicitly defined in terms of "conservation." *Id.* § 1532(5)(A).

Congress envisioned critical habitat as a *recovery tool*, requiring that it encompass all lands and water essential to the recovery of listed species. *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004). Congress clearly intended that critical habitat do more than simply prevent extinction:

> It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for that species' continued existence…. If the protection of the endangered and threatened species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat.

House Committee on Merchant Marine and Fisheries, H.R. Rep. No. 887, 94th Cong. 2nd Sess. at 3 (1976). *See also* 124 Cong. Rec. S21, 575 (daily ed. July 19, 1978) ("[T]he designation of critical habitat is more important than the designation of an endangered species itself").

The courts have reached similar conclusions: "[T]he designation of critical habitat serves as 'the principal means for conserving an endangered species, by protecting not simply the species, but also the ecosystem upon which the species depends.'" *Center for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1101 (D. Ariz. 2003) (citation omitted). The court further noted that three other courts had rejected FWS' argument that other provisions of the ESA provide equivalent protection to critical habitat. *Id.* at 1102-03. According to the Ninth Circuit:

> The ESA was enacted not merely to forestall the extinction of species (i.e., promote a species' survival), but to allow a species to recover to the point where it may be delisted. *See* 16 U.S.C. § 1532(3) (defining conservation as all methods that can be employed to "bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary"). The ESA also defines critical habitat as including "the specific areas … occupied by the species … which are … essential to the <u>conservation</u> of the species" and the "specific areas outside the geographical area occupied by the species … that ... are essential for the <u>conservation</u> of the species …."16 U.S.C. § 1532(5)(A) (emphases added). By these definitions, it is clear that Congress intended that conservation and survival be two different (though complementary) goals of the ESA. *See* 16 U.S.C. § 1533(f)(1) ("The Secretary shall develop and implement plans . . . for the <u>conservation and survival</u> of endangered species and threatened species.") (emphasis added). Clearly, then, the purpose of establishing "critical habitat" is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery.

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 16

*Gifford Pinchot*, 378 F.3d at 1070 (internal citations omitted).

Nothing in FWS' final rule addresses how the reduction in critical habitat for the imperiled northern spotted owl will affect the ability of the species to recover.  Instead, FWS bizarrely concludes that increasing timber production may somehow benefit the species and looked only to whether the elimination of protection will result in the extinction of the species. 86 Fed. Reg. at 4,841.  But FWS failed to support its revision with any scientific analysis, data, or information demonstrating that the millions of acres of critical habitat on federal lands that FWS proposes to eliminate as protected habitat are no longer essential to the conservation <u>and recovery</u> of the species.  Instead, FWS is proposing to eliminate critical habitat for political reasons, in response to a cynical lawsuit brought by the timber industry.  Basing a decision to eliminate critical habitat on a politically-motived settlement agreement is arbitrary, capricious, and not in accordance with law.

     E.      <u>FWS Failed to Consider the ESA's Precautionary Principle.</u>

FWS's final rule also flies in the face of the ESA's precautionary principle.  The ESA is designed to give endangered species the "benefit of the doubt,"  H.R. Conf. Rep. No. 96-697 at 12 (1979), and strikes the balance in "favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"  *Tenn. Valley Auth.*, 437 U.S. 194; *see* H.R. Rep. No. 93-412 at 4-5 (1973) ("The institutionalization of that caution lies at the heart of H.R. 37").  Courts invoke the precautionary principle when interpreting "the best scientific and commercial data available" clause in the context of listing decisions under ESA § 4.  *See Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 681 (D.D.C. 1997) (rejecting FWS' use of "scientific certainty" as the standard for its decision not to list the Canada lynx as a threatened species).

While the critical habitat section of the ESA allows for the consideration of economic impacts, this does not compromise the ESA's overall conservation purpose of protecting species from the threat of extinction.  *See* 16 U.S.C. § 1533(b)(6)(C)(ii) (within a year of listing, Secretary must designate habitat "to the maximum extent prudent" based "on such data as may be available at that time").  Notably, Congress observed that the value of the "genetic heritage" of endangered species is "incalculable."  H.R. Rep. No. 93-412 at 4-5 (1973).  At the same time, Congress was keenly aware of the vital role habitat played in the preservation of species.  *See* 16 U.S.C. § 1531(b) (One purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]"); S. Rep. No. 93-307 at 2 (1973) ("The two major causes of extinction are hunting and destruction of natural habitat.").

The precautionary principle is built into the overall purpose and structure of the ESA, and any evaluation as to the benefits of exclusion requires a healthy margin of error.  This margin provides a safeguard given the imperfect nature of scientific information and the need to preserve

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 17

diverse habitat in light of unanticipated degradation, including catastrophic events.

Rather than heeding the mandate of the ESA to err on the side of benefit to the species, FWS has eliminated millions of acres of critical habitat for a species that remains in perilous decline. There is no evidence that FWS considered the needs of the species prior to proposing to eliminate its critical habitat. Instead, the agency abandoned all caution when eliminating critical protections on millions of acres of habitat.

F.    FWS Failed to Prepare an Economic Analysis.

When designating or revising critical habitat, FWS is required to "make available for public comment the draft economic analysis of any critical habitat designation or revision. The draft economic analysis will be summarized in the Federal Register notice of the proposed designation of critical habitat." 50 C.F.R. 424.19(b). FWS, however, failed to conduct an economic analysis with this revision, instead relying on a critiqued report submitted by a special interest group and its own economic impact analysis from the 2012 critical habitat designation that originally found relatively minimal negative economic impacts from the designation of federal lands as critical habitat. 86 Fed. Reg. at 4,825, 4,838, 4,838; *see also* 77 Fed. Reg. at 71,946 (finding the annualized economic impact to timber harvesting from the designation of federal lands was $1.4 million annually).

FWS failure to update its economic impact analysis—the alleged primary basis for its revision—and provide it along with the proposed rule so that the public could comment on it is not harmless error. Rather, "[i]t is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. at 172. FWS abused its discretion when it failed to prepare a new economic impact analysis while rushing ahead to remove areas essential to the Northern spotted owl's recovery.

IV.    FWS FAILED TO COMPLY WITH THE APA'S NOTICE-AND-COMMENT REQUIREMENTS.

Fundamental to the APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency must publish as a proposal any rule that it is considering adopting and allow the public the opportunity to submit written comments on the proposal. 5 U.S.C. § 553. The proposal must be detailed and described with reasonable specificity to allow a meaningful opportunity to comment. This APA violation does not need to be included in a 60-day notice; we include it here to draw attention to this blatant violation of law.

To satisfy the APA's notice requirement, the proposed and the final rule need not be identical, but a "final rule which departs from a proposed rule must be a 'logical outgrowth' of the proposed rule." *NRDC v. U.S. EPA,* 279 F.3d 1180, 1186 (9th Cir.2002) (citation omitted). A final rule qualifies as a logical outgrowth if "interested parties reasonably could have

U.S. Department of Interior
U.S. Fish & Wildlife Service
Northern Spotted Owl Critical Habitat 60-Day Notice
January 19, 2021
Page 18

anticipated the final rulemaking from the draft." *Id.* "In determining this, one of the salient questions is 'whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule.'" *Id.* (citations omitted). Additionally, a final rule fails the logical outgrowth test and violates the APA's notice requirement where "interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the proposed rule." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259–60 (D.C. Cir. 2005) (internal citations omitted).

While FWS's proposed revision to the Northern spotted owl critical habitat rule sought comment on elimination of 204,653 acres of O&C lands and Tribal lands, the Final Rule excludes critical habitat protection from approximately 3.5 million acres—roughly 17 times that set forth in the proposed rule. And not only did the amount of excluded habitat change, entire categories of federal forestland have now been excluded, including matrix lands under the Northwest Forest Plan managed by the United States Forest Service. These exclusions were not part of the proposed regulation, were not discussed in any way in the proposed regulation, and could not have been anticipated. FWS's general requests for comments on topics or potential additional changes, disconnected from any specific proposals, did not provide fair notice of how the agency actually planned to finalize this critical habitat rule. FWS's promulgation of the Final Rule without adequate notice and comment as required under 5 U.S.C. § 553, is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law with the meaning of the APA, 5 U.S.C. § 706(2).

V.     CONCLUSION

FWS's issuance of the Final Rule violates the ESA, fails to use the best science, and is arbitrary and capricious. It also violates the APA, as the Final Rule is not a logical outgrowth of the proposal that the public reviewed and commented upon. If FWS fails to withdraw the Final Rule within 60 days of receiving this letter, the named organizations intend to file legal claims for declaratory and injunctive relief. *See* 16 U.S.C. § 1540(g).

If you believe any of the foregoing is in error, have any questions, or would like to discuss this matter, please do not hesitate to contact us.

Sincerely,

Kristen L. Boyles, Earthjustice
Susan Jane M. Brown, Western Envtl. Law Center
Ryan Shannon, Center for Biological Diversity



Business Addresses for Named Organizations:

**Audubon Society of Portland**
5151 NW Cornell Road
Portland, OR  97210
503-292-1021

**Cascadia Wildlands**
120 Shelton McMurphey Blvd., Suite 240
Eugene, OR  97401
541-434-1463

**Center for Biological Diversity**
1212 Broadway Street, #800
Oakland, CA  94612
510-844-7100

**Conservation Northwest**
1829 10th Ave. W, Suite B
Seattle, WA  98119
206-675-9747

**Environmental Protection Information Center**
145 G Street, Suite A
Arcata, CA  95521
707-822-7711

**Klamath-Siskiyou Wildlands Center**
PO Box 102
Ashland, OR 97520
541-488-5789

**Oregon Wild**
5825 N. Greeley Ave.
Portland, OR  97217
503-283-6343

**Sierra Club**
2101 Webster Street
Suite 1300
Oakland, CA  94612
415-977-5500

**The Wilderness Society**
2003 Western Ave., Suite 660
Seattle, WA  98121
206-624-6430